UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PINNACLE MADISON AVENUE CORPORATION,

Petitioner,

-v-

ITALIAN TRADE AGENCY (ITA), <u>an agency of the Republic of Italy</u>,

Respondent.

CIVIL ACTION NO.: 22 Civ. 3841 (AT) (SLC)

**REPORT AND RECOMMENDATION**

**SARAH L. CAVE,** United States Magistrate Judge.

**TO THE HONORABLE ANALISA TORRES**, United States District Judge:

## I. INTRODUCTION

Before the Court is the petition of Pinnacle Madison Avenue Corporation ("Pinnacle") seeking to gain access to property owned by Respondent Italian Trade Agency ("ITA"), pursuant to Section 881 of the New York Real Property Actions and Proceedings Law ("Section 881"). (ECF No. 1-2 (the "Petition")). ITA opposes the Petition and asserts counterclaims against Pinnacle (the "Counterclaims") and a third-party claim (the "Third-Party Claim") against the City of New York Landmark Preservation Commission (the "LPC"). (ECF No. 10 (the "Opposition")).

For the reasons set forth below, the Court respectfully recommends that: (i) the Petition be GRANTED; (ii) the Counterclaims be DISMISSED WITHOUT PREJUDICE; and (iii) the Third-Party Claim be DISMISSED WITHOUT PREJUDICE.

## II. <u>BACKGROUND</u>

### A. <u>Factual Background</u>[1]

Since the 1970s, Pinnacle has owned a five-story commercial property at 793 Madison Avenue in Manhattan (the "Pinnacle Property").  (ECF Nos. 1-2 ¶ 11; 10 ¶ 47).  ITA owns the five-story commercial office building (the "ITA Building") and grounds at 33 East 67th Street (the "ITA Grounds," together with the ITA Building, the "ITA Property") immediately east of the Pinnacle Property.  (ECF Nos. 1-2 ¶ 13; 10 ¶ 46).

In spring 2020, Pinnacle submitted to the LPC an application to, <u>inter alia</u>, construct a backyard elevator, conduct excavations, and install underpinnings.  (ECF Nos. 10 ¶ 49; 10-1 at 1).[2]  In May 2020, Pinnacle also submitted to the Manhattan Community Board 8 Landmark Committee (the "Committee"),[3] a construction proposal to undertake "elevator and lobby additions, facades, and replacement of HVAC equipment, internal stairs[,] and upper story windows."  (ECF No. 10-2 at 1; <u>see</u> ECF No. 10 ¶ 50 (the "First Proposal")).  On June 19, 2020, the Committee granted in part and denied in part the First Proposal (the "First Resolution").  (ECF No. 10-2 at 1–2; <u>see</u> ECF No. 10 ¶ 51).  The First Resolution permitted work on the Pinnacle Property storefront, including demolition of the existing two-story storefront and construction of "a new storefront with a bronze fascia at the first and second floor levels[,]" but denied

---

[1] Unless otherwise indicated, the Court draws the facts from the Petition, the Opposition, and the affidavits and corresponding exhibits both parties have submitted.  (ECF Nos. 1-2; 1-3 – 1-30; 10; 10-1 – 10-33; 14–15; 14-1 – 14-3; 18–19; 19-1 – 19-2; 26-1).

[2] The Application is undated.  (<u>See</u> ECF No. 10-1 at 1–2).

[3] The Committee is the "local representative body of Manhattan Upper East Side" and "provides an advisory role to other NYC regulatory entities, like the LPC."  (ECF No. 10 ¶ 50).

Pinnacle's request "to place a new elevator shaft in the north east portion of the yard[,]" finding several deficiencies in the First Proposal.[4]  (ECF No. 10-2 at 1–3).

Pinnacle subsequently submitted to the Committee a revised proposal for permission to undertake "elevator and lobby additions to the rear yard and new storefronts for the front and rear portions of the" Pinnacle Property.  (ECF No. 10-4 at 1 (the "Second Proposal")).  On September 22, 2020, the Committee granted the Second Proposal.  (Id. at 1–2).  The Committee acknowledged that the Second Proposal reflected that Pinnacle had "redesigned the façade along East 67th Street[,]" such that "the current design retains the masonry character of the building on 67th Street . . . [and] is contextual and appropriate within the historic district[.]"  (Id.)

On December 15, 2020, the LPC held a public hearing (the "Hearing"), at which Pinnacle presented the renovations to the Pinnacle Property that the Committee had approved (the "Project").  (ECF No. 10 ¶ 58).  Friends of the Upper East Side ("Friends"),[5] appeared at the Hearing to oppose the Project, which it nevertheless conceded was "allowable under current zoning resolution[.]"  (ECF No. 10-5; see ECF No. 10 ¶¶ 60–61).

On July 8, 2021, Pinnacle informed ITA that it had engaged a contractor, i.e., Vanguard Construction & Development Co., Inc. ("Vanguard" or the "Contractor"), to renovate and "construct an addition on the rear of" the Pinnacle Property.  (ECF No. 10-7 at 1; see ECF No. 10-

---

[4] The deficiencies the Committee highlighted included the findings that:  "the design is unresolved due to the termination of the fire escape at the roof of the lobby with no provision for continuing to grade[,]" "building in the yard will eliminate the opening between [the Pinnacle Property] and the [ITA Building], thereby eliminating the view[,]" "the proposed continuous storefront has a slickness and an architectural language that does not acknowledge the residential character of the block[,]" and the yard, as it stands, "creates the kind of serendipitous experience that happens in residential neighborhoods[.]"  (ECF No. 10-2 at 2–3).

[5] Friends is a not-for-profit neighborhood organization "dedicated to preserving and celebrating the architectural legacy, livability, and sense of place of the Upper East Side."  (ECF No. 10 ¶ 60).

23).  Pinnacle acknowledged its obligation under "the New York City Building Code to install protection on and around the" ITA Property, and requested permission for the Contractor to access the ITA Property to install protective measures.  (ECF No. 10-7 at 1).  Pinnacle provided to ITA:  (i) a proposed site safety plan, including proposed protective measures (the "Safety Plan"), and (ii) a draft Construction Access License Agreement (the "Draft Agreement").  (ECF No. 10-7 at 1; see ECF No. 10-8 at 1–13).

From July through September 2021, Pinnacle and ITA amicably negotiated revisions to the Draft Agreement.  (ECF Nos. 10-8 – 10-11).  On September 3, 2021, Pinnacle advised ITA that it was still awaiting approval from the LPC and a scaffolding permit from the New York City Department of Buildings ("DOB").  (ECF No. 10-11 at 1).  On September 14, 2021, Pinnacle urged ITA to complete its review of the Draft Agreement and the Project plans.  (ECF No. 10-12 at 6–7).  ITA reminded Pinnacle that it was "not dealing with a single company or individual that can take immediate decisions[,]" but instead that "for each document, authorization, contract submitted to our client or even a little change, [ITA] ha[s] to wait for a long bureaucratic validation process with the HQs in Rome where the[re] are several offices involved at the Italian Department of State and . . . the Italian DOJ."  (Id. at 5–6).

On September 23, 2021, Pinnacle reiterated to ITA its frustration with the delays in finalizing the Draft Agreement, and stated its intent to file a Section 881 petition once the LPC and the DOB permits were issued.  (ECF No. 10-12 at 3–5).  On September 24, 2021, ITA responded:

> If you want to prepare [a] Section 881 petition, we believe this will certainly clarify many open issue[s] (e.g. the amount of fees) but also aggravate your client's costs. These legal costs are not caused by our client. But of course, we will be glad to discuss this in court.

(Id. at 1–2).

On October 11, 2021, ITA shared with Pinnacle concerns that ITA's architect, Kurt Hirschberg ("Hirschberg"),[6] had with the Project, including:  (a) "[t]here are no details provided for protection of the retaining wall, areaway, wall finishes, or which protection is to be used at the windows of" the ITA Building; (b) the Safety Plan was incomplete; (c) "[t]here are no construction/foundation details for the elevator in the documents provided"; and (d) "[t]here are no details for excavation, shoring, bracing and dewatering."  (ECF No. 10-15 at 1–5 (the "Hirschberg's Concerns"); see ECF No. 10 ¶ 78).  Twice, Pinnacle invited Hirschberg to meet the Project team on-site, but no such meeting occurred.  (ECF Nos. 10-16 at 2; 10-19).  Pinnacle also provided detailed written responses to each of Hirschberg's Concerns.  (ECF No. 10-19; see generally ECF No. 10-20).

On November 16, 2021, the LPC approved the Project.  (ECF Nos. 1-2 ¶ 12; 10-21 at 1).  On March 11, 2022, Pinnacle advised ITA that it had "received all required permits and approvals for construction of its [P]roject," and:

> [t]he building permit (issued February 17th) was issued based on Pinnacle's original construction plans, which included an elevator extending to the basement of Pinnacle's building and extension of Pinnacle's foundation. Given [ITA]'s refusal to discuss a reasonable compromise regarding the need for Pinnacle to protect [ITA]'s property (including to support [ITA]'s wall located on the property line between Pinnacle's and [ITA]'s property), Pinnacle substantially revised its original construction plans (at great expense to Pinnacle) to eliminate its basement-level elevator and the related excavation, which in turn eliminates the need for Pinnacle to support [ITA]'s wall along the property line. Those revised plans have been submitted to the DOB as a post-approval amendment [] and, we understand, do not require re-issuance or revision of the building permit.

---

[6] Hirschberg is an Associate Partner at Jan Hird Pokorny Associates, Inc.  (ECF No. 10-29 ¶ 2).

> Additionally, given [ITA]'s objections to Pinnacle's planned erection of overhead protection on the alley adjacent to [ITA]'s building, Pinnacle substantially revised its original protection plans (again, at great expense to Pinnacle) to provide protection of [ITA]'s property through the use of cantilevered netting over the alley (which protection will not touch [ITA]'s property, including the wall along the property line) rather than the installation of overhead protection on the alley as previously proposed. That protection is depicted in revised plans, which have been reviewed and approved by the DOB, and are also uploaded for your review to our secure file-sharing site.
>
> . . .
>
> It is imperative that Pinnacle be able to proceed with its project immediately. As such, please let us know by Friday, March 18th whether [ITA] is willing to enter into an agreement to permit access to its property on reasonable terms (and what [it] proposes those terms to be). If we have not received an acceptable response from [ITA] by Friday, March 18th, Pinnacle will pursue the necessary access pursuant to [Section] 881.

(ECF No. 10-22 at 1–2; <u>see</u> ECF No. 1-2 ¶ 19).  On March 15, 2022, ITA proposed resuming negotiations, predicated on Pinnacle's "payment of [ITA's] legal fees" within one week, after which ITA would agree to a meeting between the parties' lawyers and architects.  (ECF No. 1-25 at 96).

On March 17, 2022, Vanguard informed ITA that it was beginning excavation for the new elevator at the Pinnacle Property.  (ECF No. 10-23).  On April 26, 2022, the DOB issued a Partial Stop Work Order (the "SWO") that instructed Pinnacle to:  "Stop all struct[ural]/interior work/use of scaff[olding]/scaff[olding] on [sidewalk]-obta[]in permit/return to previous cond[ition]s/conform plans/L.I. Letter[.]"  (ECF No. 10-33 at 2; <u>see</u> ECF No. 10-24 at 2).  On May 13, 2022, ITA photographed what appeared to be Pinnacle "continuing to conduct excavation works[.]"  (ECF Nos. 10 ¶ 99; 10-25 at 1–4).  On May 17, 2022, the DOB issued a "Stop Work Reinspection Failure[,]" (the "Reinspection Notice"), instructing Pinnacle:  "Rescind denied. No work allowed.  Obtain amended [Support of Excavation ("SOE")] plan and obtain permit[.]"

(ECF No. 10-33 at 2).  On June 13, 2022, the DOB issued a permit to allow Pinnacle to begin excavation work.  (ECF No. 19-2; <u>see</u> ECF No. 19 ¶ 3).  On June 15, 2022, the DOB issued a "Stop Work Rescind Order[,]" which rescinded the SWO and permitted Pinnacle "to continue SOE work."  (ECF Nos. 19 ¶ 3; 19-3; <u>see</u> ECF No. 10-33 at 2).

## B. Procedural Background

On March 31, 2022, Pinnacle commenced a Section 881 proceeding in New York State Supreme Court seeking a 15-month license to access the ITA Property.  (ECF No. 1-2 ¶ 46 (the "Section 881 Proceeding")).[7]  On April 8, 2022, the Honorable Paul A. Goetz ordered ITA to show cause by May 16, 2022 why Pinnacle should not be granted a 15-month license to enter the ITA Property.  (ECF No. 1-29 at 2–4 (the "OTSC")).

On May 11, 2022, before the OTSC return date, ITA removed the Section 881 Proceeding to this Court under 28 U.S.C. §§ 1441(d) and 1603(b), citing ITA's status as a governmental agency or instrumentality of the Republic of Italy, and invoking federal subject matter jurisdiction under 28 U.S.C. § 1330(a).  (ECF No. 1 ¶¶ 3–5).  Pinnacle has not challenged the removal, but has asked the Court to grant the OTSC as unopposed, or alternatively, resolve the Petition on an expedited basis.  (ECF No. 5 at 1–2).

---

[7] Pinnacle sought a license that would allow access for the following purposes and time periods:  (1) "For two working days to permit workers to survey the existing condition of portions of the" the ITA Property, at the commencement of the Project; (2) "For two working days to permit workers to install" vibration monitors (the "Monitors") at the ITA Property, at the commencement of the Project; (3) "For five working days to permit workers to install" a system of cantilevered supports above the ITA Property (the "Overhead Protection"), at the commencement of the Project; (4) "For five working days to permit workers to dismantle the Overhead Protection[,]" at the conclusion of the Project; (5) "For two working days to permit workers to remove the Monitors from" the ITA Property, at the conclusion of the Project; (6) "For two working days to permit workers to conduct a survey of the existing condition of the" ITA Property, at the conclusion of the Project.  (ECF No. 1-2 at ¶ 46).

On May 19, 2022, following some technical difficulties, (see ECF Nos. 7–9), ITA filed the Opposition.[8]  (ECF No. 10).  In the Opposition, ITA asserted the Counterclaims against Pinnacle for negligence, alleging that, in the process of obtaining approval from the Committee, the LPC, and the DOB, Pinnacle violated N.Y.C. Admin. Code §§ 2-16, 25-305(b)(1), and 3301.13.1.  (ECF No. 10 ¶¶ 109–26).  ITA also asserted the Third-Party Claim against the LPC accusing LPC of negligence in approving the Project.  (Id. ¶¶ 127–32).

The Honorable Analisa Torres granted Pinnacle's request to file a reply in further support of the Petition by June 6, 2022, and a response to the Counterclaims by June 21, 2022.  (ECF No. 13 at 2).  On June 6, 2022, Pinnacle filed a reply memorandum of law (ECF No. 16 (the "Reply")), accompanied by affidavits from Ed Tostanoski, an employee of Vanguard, and Bruno Caligara, an employee of Metropolis Group, Inc., Pinnacle's "building permit expediter[.]"  (ECF Nos. 14–15).

On June 16, 2022, Pinnacle filed a reply declaration of Eddy Salcedo, Esq. ("Salcedo"), Pinnacle's counsel, and additional exhibits.  (ECF Nos. 17; 19 – 19-3).[9]  On June 21, 2022, Pinnacle filed an Answer to the Counterclaims.  (ECF No. 20).

On July 12, 2022, with the Court's permission, ITA filed a sur-reply.  (ECF No. 26 (the "Sur-Reply)).  On August 3, 2022, Pinnacle advised the Court that it "is now at risk of losing [the] [C]ontractor and has incurred, and will continue to incur, substantial expenses in the form of,

---

[8] With the Opposition, ITA filed various exhibits, unaccompanied by any declaration of counsel attesting to their identity or provenance, (ECF Nos. 10-1 – 10-33), and a memorandum of law (ECF No. 11).  See Dorchester Fin'l Holdings Corp. v. Banco BRJ, S.A., No. 11-CV-1529 (KMW)(KNF), 2014 WL 3747160, at *6 (S.D.N.Y. July 3, 2014) (deeming inadmissible exhibits submitted as attachments to memorandum of law without an accompanying affidavit).

[9] Pinnacle filed two copies of Salcedo's declaration, one with exhibits and one without.  (Compare ECF No. 18 with ECF No. 19).  The Court refers only to the latter.

among other things, interest charges on its loan and additional construction related costs"
because of, inter alia, "[t]he removal to this Court[.]"  (ECF No. 27 at 1).  On August 4, 2022, Judge
Torres referred the Petition for a report and recommendation.  (ECF No. 28).

### III.  DISCUSSION

Because ITA is an agency or instrumentality of the Republic of Italy (ECF Nos. 1-2 ¶ 41; 10
at 1), a threshold question for the Court is whether ITA is immune from the jurisdiction of United
States courts.  (See § III.A, infra).  After resolving that question, the Court addresses whether it
may exercise personal jurisdiction over ITA.  (See § III.B, infra).  The Court then considers the
merits of the Petition, (see § III.C, infra), before analyzing the Counterclaims and Third-Party
Claim.  (See §§ III.D, III.E, infra).

### A.  Federal Subject-Matter Jurisdiction

#### 1.  Legal Standard

Federal courts "have an independent obligation to determine whether subject-matter
jurisdiction exists, even in the absence of a challenge from any party."  Arbaugh v. Y&H Corp.,
546 U.S. 500, 514 (2006) (citing Ruhrgas AG v. Marathon Oil Co., 526 U.S. 574, 583 (1999)).
"When a federal court concludes that it lacks subject-matter jurisdiction, the court must dismiss
the [claims] in [their] entirety."  Chapman v. U.S. Dep't of Just., 558 F. Supp. 3d 45, 49 (E.D.N.Y.
2021) (citing Arbaugh, 546 U.S. at 514)); see Fed. R. Civ. P. 12(h)(3).

The Foreign Sovereign Immunities Act of 1976, 28 U.S.C. §§ 1330, 1602–11 ("FSIA"),
"supplies 'the sole basis for obtaining jurisdiction over a foreign state in the courts of this
country.'"  Kern v. Oesterreichische Elektrizitaetswirschaft Ag, 178 F. Supp. 2d 367, 372 (S.D.N.Y.
2001) (quoting Saudi Arabia v. Nelson, 507 U.S. 349, 355 (1993)); see Shapiro v. Republic of

Bolivia, 930 F.2d 1013, 1017 (2d Cir. 1991) ("The FSIA is the exclusive source of subject matter jurisdiction in suits involving foreign states."). Foreign sovereigns and their agencies and instrumentalities are "immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607 of this chapter." 28 U.S.C. § 1604; see Nelson, 507 U.S. at 355 ("Under the [FSIA], a foreign state is presumptively immune from the jurisdiction of United States courts; unless a specified exception applies, a federal court lacks subject-matter jurisdiction over a claim against a foreign state."). "With respect to any claim against a foreign sovereign that falls within the statutory exceptions to immunity listed in § 1605, 'the foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances.'" Honda v. Vieira, No. 19 Civ. 10661 (CM), 2020 WL 528002, at *2 (S.D.N.Y. Feb. 3, 2020) (quoting 28 U.S.C. § 1606). "In any other case against a foreign sovereign, an agency or instrumentality, a federal court lacks subject matter jurisdiction over the suit." Kern, 178 F. Supp. 2d at 372 (citing Nelson, 507 U.S. at 355).

### 2.  Application

Pinnacle does not dispute that ITA is an agency or instrumentality of a foreign state under 28 U.S.C. § 1603 and thus "is entitled to the restrictive immunity the FSIA provides." (ECF No. 1-2 ¶ 41). Pinnacle contends that two exceptions in the FSIA permit the Court to exercise jurisdiction over the Petition: (i) the commercial activity exception, 28 U.S.C. § 1605(a)(2), and (ii) the immovable property exception, 28 U.S.C. § 1605(a)(4). ITA admits that these two FSIA exceptions apply. (ECF Nos. 1-2 ¶¶ 41–45; 10 ¶¶ 41–45). Notwithstanding the lack of any challenge to subject matter jurisdiction, the Court must still examine whether either exception

applies.  See Arbaugh, 546 U.S. at 514; Chapman, 558 F. Supp. 3d at 49 (examining jurisdiction even though no party had contested it).

### a.  Commercial Activity Exception

The commercial activity exception to the FSIA applies when an "action is based upon a commercial activity carried on in the United States by the foreign state[.]" 28 U.S.C. § 1605(a)(2); see Harvey v. Permanent Mission of the Republic of Sierra Leone to the United Nations, No. 21 Civ. 4368 (ER), 2022 WL 2392101, at *3–4 (S.D.N.Y. July 1, 2022) (citing 28 U.S.C. § 1605(a)(2)).  A foreign sovereign agency or instrumentality engages in commercial activity for purposes of the FSIA when it "exercises only those powers that can also be exercised by private citizens, rather than those powers peculiar to sovereigns[.]" Nelson, 507 U.S. at 349 (citing Republic of Argentina v. Weltover, Inc., 504 U.S. 607, 614 (1992)).  Based on the FSIA's legislative history, the Second Circuit has identified several examples of commercial activities, including:

> [a]ctivities such as a foreign government's sale of a service or product, its leasing of property, its borrowing of money, its employment or engagement of laborers, clerical staff or public relations or marketing agents or its investment in a security of an American corporation . . . .

De Letelier v. Republic of Chile, 748 F.2d 790, 796 (2d Cir. 1984) (citing S. Rep. No. 94–1310, at 16 (1976)).

"The threshold step in assessing the applicability of the commercial activity exception is to identify the act of the foreign sovereign [] that serves as the basis for plaintiffs' claims." Rukoro v. Fed. Republic of Germany, 363 F. Supp. 3d 436, 444 (S.D.N.Y. 2019) (quoting Garb v. Republic of Poland, 440 F.3d 579, 586 (2d Cir. 2006)) (internal quotation marks omitted).  Federal courts have a "great deal of latitude" to decide whether a given commercial behavior warrants the

application of an immunity exception.  De Letelier, 748 F.2d at 796–97; see S. REP. NO. 94–1310, at 16 ("It will be for the courts to determine whether a particular commercial activity has been performed in whole or in part, in the United States.").  Despite the broad meaning, courts still require "a significant nexus between the commercial activity and a plaintiffs' cause of action[,]" Harvey, 2022 WL 2392101, at *3 (collecting cases), and courts do  "not deem activity 'commercial' as a whole simply because certain aspects of it are commercial."  De Letelier, 748 F.2d at 796.

Here, the parties do not dispute that the ITA Building "is a 5-story commercial office building[.]"  (ECF Nos. 1-2 ¶ 13; 10 ¶ 13).  The ownership of commercial property is a right in which private citizens can engage, not a "power[] peculiar to sovereigns[.]"  EM Ltd. v. Republic of Argentina, 473 F.3d 463, 482 (2d Cir. 2007) (quoting Weltover, Inc., 504 U.S. at 614).  ITA is the target of Pinnacle's Petition solely due to ITA's ownership of the ITA Property, to which Pinnacle seeks access to undertake the Project.  (See ECF Nos. 1-2 ¶ 45; 10 ¶ 45).  Accordingly, the Court finds that the commercial activity exception permits the exercise of subject matter jurisdiction over the Petition.

### b.  Immovable Property Exception

The FSIA's immovable property exception derives from the traditional common law recognition of "an 'exception to sovereign immunity for actions to determine rights in immovable property.'"  Cayuga Indian Nation of N.Y. v. Seneca Cnty., N.Y., 978 F.3d 829, 836 (2d Cir. 2020) (quoting Upper Skagit Indian Tribe v. Lundgren, 138 S. Ct. 1649, 1655 (2018) (Roberts, C.J., concurring)); see Eisenberg v. Permanent Mission of Equatorial Guinea to United Nations, 832 F. App'x 38, 39 (2d Cir. 2020) ("The FSIA provides that a foreign state is subject to the jurisdiction of a federal district court in any civil action in which 'rights in immovable property situated in the

United States are in issue.'") (quoting 28 U.S.C. § 1605(a)(4)).   "[C]ourts [] have generally understood the immovable-property exception as permitting only those lawsuits against a sovereign that 'contest[]' its rights or interests in real property." <u>Cayuga Indian Nation</u>, 978 F.3d at 836 (quoting Rest. (2d) of For. Rel. L. of the U.S. § 68 cmt. d (Am. L. Inst. 1965)).  In other words, the immovable property exception applies "only [to] those disputes that require the court to resolve competing claims to a right or interest in real property." <u>Cayuga Indian Nation</u>, 978 F.3d at 837 (citing Rest. (2d) of For. Rel. L. of the U.S. § 68 cmt. d (Am. L. Inst. 1965)).

Here, because Pinnacle is seeking access to the ITA Property, (ECF No. 1-2 ¶ 46), the Petition implicates ITA's "'rights in immovable property situated in the United States[.]'" <u>Eisenberg</u>, 832 F. App'x at 39 (quoting 28 U.S.C. § 1605(a)(4)).  Pinnacle seeks "a license to permit [it] access" to the ITA Property for 15 months, (<u>see</u> ECF No. 1-2 ¶ 46), which, if granted, would impinge on "one of the quintessential rights of property ownership[,]" <u>Permanent Mission of India to the United Nations v. City of N.Y.</u>, 551 U.S. 193, 198 (2007), <u>i.e.</u>, ITA's "'right to exclude others[.]'" <u>Byrd v. United States</u>, 138 S. Ct. 1518, 1527 (2018) (quoting <u>Rakas v. Illinois</u>, 439 U.S. 128, 143 n.12 (1978)); <u>see</u> <u>Cedar Point Nursery v. Hassid</u>, 141 S. Ct. 2063, 2072 (2021) ("The right to exclude is 'one of the most treasured' rights of property ownership.") (quoting <u>Loretto v. Teleprompter Manhattan CATV Corp.</u>, 458 U.S. 419, 435 (1982)).  Therefore, the immovable property exception also applies to permit the Court to exercise subject matter jurisdiction over the Petition.

Accordingly, the Court finds that, because two exceptions to the FSIA apply, the FSIA does not preclude the exercise of federal subject matter jurisdiction over the Petition.

**B.  Personal Jurisdiction**

The Court "must also have personal jurisdiction over [ITA] in order to enter a binding judgment against it."  Gater Assets Ltd. v. AO Moldovagaz, 2 F.4th 42, 49 (2d Cir. 2021).  The FSIA confers personal jurisdiction over a foreign sovereign, agency, or instrumentality:

> as to every claim for relief over which the district courts have jurisdiction under subsection (a) where service has been made under section 1608 of this title.

28 U.S.C. § 1330(b); see Harvey, 2022 WL 2392101, at *3.  For personal jurisdiction to exist under § 1330(b), two requisites must be met:  "(1) an exception from jurisdictional immunity established by the FSIA applies, and (2) the sovereign has been served with process in accordance with the FSIA's provisions."  Mobil Cerro Negro, Ltd. v. Bolivarian Republic of Venezuela, 863 F.3d 96, 104 (2d Cir. 2017) (quoting 28 U.S.C. § 1330(b)).  Thus, under the FSIA, "personal jurisdiction equals subject matter jurisdiction plus valid service of process."  Shapiro, 930 F.2d at 1020; see Weininger v. Castro, 462 F. Supp. 2d 457, 475 (S.D.N.Y. 2006) ("Under the FSIA, personal jurisdiction is achieved where the court has subject matter jurisdiction pursuant to the FSIA and service has been made on the foreign state under FSIA § 1608.") (citing 28 U.S.C. § 1330(b)).

Section 1608(b) of the FSIA governs service on the agency or instrumentality of a foreign state, and requires service by one of the following methods:

> (1) by delivery of a copy of the summons and complaint in accordance with any special arrangement for service between the plaintiff and the agency or instrumentality; or
>
> (2) if no special arrangement exists, by delivery of a copy of the summons and complaint either to an officer, a managing or general agent, or to any other agent authorized by appointment or by law to receive service of process in the United States; or in accordance with an applicable international convention on service of judicial documents; or

(3) if service cannot be made under paragraphs (1) or (2), and if reasonably calculated to give actual notice, by delivery of a copy of the summons and complaint, together with a translation of each into the official language of the foreign state--

(A)      as directed by an authority of the foreign state or political subdivision in response to a letter rogatory or request or

(B)      by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the agency or instrumentality to be served, or

(C)      as directed by order of the court consistent with the law of the place where service is to be made.

28 U.S.C. § 1608(b)(1)–(3).

In evaluating whether service complies with § 1608(b), "courts apply a substantial compliance test, not the strict compliance test applicable under [§] 1608(a)." Trans Comm., Inc. v. Kazakstan Trading House, No. 96 Civ. 9782 (BSJ), 1997 WL 811474, at *4 n.7 (S.D.N.Y. May 28, 1997); see In re Terrorist Attacks on Sept. 11, 2001, No. 03 MD. 1570 (GBD) (SN), 2022 WL 1088567, at *7 (S.D.N.Y. Apr. 5, 2022) ("Recognizing that 'substantial compliance' is the touchstone for effective service under § 1608(b)," permitting plaintiffs to satisfy § 1608(b)(3) "by providing a translation in any language spoken by a substantial percentage of [the foreign sovereign]'s population"); In re Perry H. Koplik & Sons, Inc., 357 B.R. 231, 249–50 (Bankr. S.D.N.Y. 2006) (noting that federal courts in this District "have determined that strict compliance with [§] 1608(b)(3) is not mandatory, and that substantial compliance suffices to satisfy the service requirements").

Here, Pinnacle has not provided evidence of service of the Petition on ITA in accordance with any of the provisions of § 1608(b)(1)–(3).  Instead, the record reflects that Pinnacle twice asked ITA's counsel whether they were authorized "to accept service of the [Section] 881 petition

on behalf of the Republic of Italy."  (ECF Nos. 10-14 at 1–2; 1-22 at 52–53).  In response to these requests, ITA's counsel first implicitly, and then explicitly, responded that they were not "authorized to accept service."  (ECF No. 1-23 at 2–3; see 10-12 at 1–2 ("If you want to prepare [a] Section 881 petition, we believe this will certainly clarify many open issue[s] (e.g. the amount of fees) but also aggravate your client's costs. These legal costs are not caused by our client. But of course, we will be glad to discuss this in court.")).  Pinnacle recognized this, and "[t]hank[ed] [ITA's counsel] for confirming that [they were] not authorized to accept service of the [Section] 881 petition."  (ECF No. 1-23 at 1).  Despite this knowledge, on April 12, 2022, Pinnacle delivered the OTSC—in English—to ITA's counsel, which does not constitute effective service under any subsection of § 1608(b).  (ECF No. 1-30 at 2).

Because ITA's counsel was not authorized to accept service on behalf of ITA, (see ECF Nos. 1-23 at 2–3; 1-30 at 2), and Pinnacle has provided no evidence of any compliance with the service requirements in § 1608(b)(1)–(3), the exercise of personal jurisdiction over ITA under 28 U.S.C. § 1330(b) is questionable.  See In re Koplik, 357 B.R. at 249–50 (finding the "[t]rustee substantially complied with [§] 1608(b)(3), and cured the initial defect [in failing to serve a translated document] by quickly re-serving [foreign instrumentality] with translated copies"); see Mobil, 863 F.3d at 124 (2d Cir. 2017) (finding the district court lacked personal jurisdiction over the foreign sovereign where the plaintiff "did not serve [foreign sovereign] in accordance with the FSIA"); Chettri v. Nepal Bangladesh Bank, Ltd., No. 10 Civ. 8470 (PGG), 2014 WL 4354668, at *9 (S.D.N.Y. Sept. 2, 2014) (same), aff'd, Chettri v. Nepal Rastra Bank, 834 F.3d 50 (2d Cir. 2016). The service requirements of § 1608(b)(3) are not onerous, making Pinnacle's failure to effect service properly, particularly given ITA's counsel's express disavowal of authority to accept

service, particularly glaring.  See Concord Reins. Co. v. Caja Navional De Ahorro Y Seguro, No. 93 Civ. 6606 (JSM), 1994 WL 86401, at *3 (S.D.N.Y. Mar. 16, 1994) (dismissing for lack of personal jurisdiction, noting "the ease with which plaintiff could have complied with the specific terms of § 1608(b)(3)").

Despite Pinnacle's failure to comply with § 1608(b)'s service requirements, however, ITA has nevertheless removed the Section 881 Proceeding to, and appeared in, this Court, represented by a law firm with offices in New York, and has not contested the Court's exercise of personal jurisdiction in its Opposition or its Sur-Reply, such that it has waived any challenge to personal jurisdiction.  See Gore v. RBA Grp., Inc., No. 03 Civ. 9442 (RJS), 2009 WL 884565, at *5 (S.D.N.Y. Mar. 27, 2009) (explaining that party's "actual knowledge of a suit coupled with extensive participation in pretrial proceedings" waived challenge to effective service) (internal citation omitted); Burton v. Northern Dutchess Hosp., 106 F.R.D. 477, 480 (S.D.N.Y. 1985) ("It is well settled that lack of personal jurisdiction is a privileged defense that can be waived by failure to assert it seasonably, by formal submission in a cause, or by submission through conduct.") (quoting Neirbo Co. v. Bethlehem Shipbuilding Corp., 308 U.S. 165, 168 (1939) (internal quotation marks and alterations omitted)); Fed. R. Civ. P. 12(h)(1) (specifying when improper service defense is waived).  The Court also finds that ITA "had actual notice and knowledge of the" Petition, and has not demonstrated any prejudice.  See In re Koplik, 357 B.R. at 250.  Accordingly, the Court concludes that it is proper to exercise personal jurisdiction over ITA to adjudicate the Petition.

**C.  Section 881**

The Court now turns to the merits of the Petition seeking access to the ITA Property.

1. **Legal Standard**

Section 881 provides:

> When an owner or lessee seeks to make improvements or repairs to real property so situated that such improvements or repairs cannot be made by the owner or lessee without entering the premises of an adjoining owner or his lessee, and permission so to enter has been refused, the owner or lessee seeking to make such improvements or repairs may commence a special proceeding for a license so to enter pursuant to article four of the civil practice law and rules. The petition and affidavits, if any, shall state the facts making such entry necessary and the date or dates on which entry is sought. Such license shall be granted by the court in an appropriate case upon such terms as justice requires. The licensee shall be liable to the adjoining owner or his lessee for actual damages occurring as a result of the entry.

N.Y. Real Prop. Acts. L. § 881.  This statute "allows a property owner to petition for a license to enter the premises of an adjoining owner when such entry is necessary for making improvements or repairs to the petitioner's property and the adjoining owner has refused such access." AIH Grp., LLC v. C.J.F. & Sons Enterprises, Inc., 63 Misc. 3d 1231(A), at *3 (Sup. Ct. Queens Cnty. 2019); see In re Neptune Assocs. LLC v. Trump Village Section 4, Inc., No. 531399/2021, 2022 WL 385015, at *1 Sup. Ct. Kings Cnty. 2022) ("It is well settled that in order to be entitled to access pursuant to [Section] 881, the petitioner must petition for a license to enter the premises of the adjoining neighbor for necessary improvements or repairs and the adjoining landowner has refused access[.]") (citing Queens Coll. Special Projects Fund, Inc. v. Newman, 154 A.D.3d 943, 943 (2017)); see Sunrise Jewish Ctr. of Valley Stream, Inc. v. Lipko, 61 Misc. 2d 673, 675 (Sup. Ct. Nassau Cnty. 1969) ("The statute contemplates a temporary license, not a permanent easement.").

"A proceeding pursuant to [Section] 881 is addressed to the sound discretion of the court, which must apply a reasonableness standard in balancing the potential hardship to the applicant

if the petition is not granted against the inconvenience to the adjoining owner if it is granted[.]" Queens Theater Owner, LLC v. WR Universal, LLC, 192 A.D.3d 690, 690 (2d Dep't 2021) (citing Special Projects Fund, 154 A.D.3d at 943–44); see Voron v. Bd. of Managers of Newswalk Condo., 186 A.D.3d 833, 835 (2d Dep't 2020) ("Voron II") ("A proceeding pursuant to [Section] 881 is addressed to the sound discretion of the court[.]") (citing Van Dorn Holdings, LLC v. 152 W. 58th Owners Corp., 149 A.D.3d 518 (1st Dep't 2017)).

New York courts have "recognized that a [Section] 881 license need not be routinely granted and that the court is required to consider the competing interests of the two adjoining landowners before reaching its conclusion whether to do so." Deutsche Bank Tr. v. 120 Greenwich Dev. Assocs., 7 Misc. 3d 1006(A), at *3 (Sup. Ct. N.Y. Cnty. 2005) (citing Chase Manhattan Bank (Nat. Ass'n) v. Broadway, Whitney Co., 59 Misc. 2d 1085, 1095 (Sup. Ct. Queens Cnty. 1969)) ("Chase II"); see Matter of Rosma Dev., LLC v. South, 5 Misc. 3d 1014(A), at *3 (Sup. Ct. Kings Cnty. 2004) ("The court must balance the competing interests of the parties and should grant the issuance of a license when necessary, under reasonable conditions, and where the inconvenience to the adjacent property owners is outweighed by the hardship of their neighbors if the license is refused[.]") (citing Chase Manhattan Bank (Nat. Ass'n) v. Broadway, Whitney Co., 57 Misc. 2d 1091, 1092 (Sup. Ct. Queens Cnty. 1968) ("Chase I")).  The factors New York courts consider in determining whether to grant a license under Section 881 "include the nature and extent of the requested access, the duration of the access, the protections to the adjoining property that are needed, the lack of an alternative means to perform the work, the public interest in the completion of the project, and the measures in place to ensure the financial compensation of the adjoining owner for any damage or inconvenience resulting from the

intrusion[.]"  Special Projects Fund, 154 A.D.3d at 944 (collecting cases); see Neptune, 2022 WL

385015, at *1 (same) (citing Chirichella v. BCBS Lorimer LLC, No. 505985/2017, 2017 WL 3386257,

at *4 (Sup. Ct. Kings Cnty. 2017)); Queens Theater, 192 A.D.3d at 690–91 (same); Voron II, 186

A.D.3d at 835 (same).

     In granting a license, a court may also "order the petitioner to fulfill additional terms and

conditions[,]" including:  "posting a bond, obtaining insurance coverage, agreeing to indemnify

the adjacent landowner and/or paying for the use of the license."  Deutsche Bank, 7 Misc. 3d

1006(A), at *2; see Ponito Residence LLC v. 12th St. Apt. Corp., 38 Misc. 3d 604, 612 (Sup. Ct. N.Y.

Cnty. 2012) ("A court may also require that the licensee fulfill additional terms as a condition of

the license, including posting a bond, paying periodic license fees, and obtaining insurance

coverage.") (internal citations and alterations omitted).

     **2.  Application**

     As set forth above, Pinnacle seeks a license to access the ITA Property to conduct a survey,

install the Monitors and Overhead Protection to remain in place throughout the Project, and, at

the conclusion of the Project, dismantle the Overhead Protection, remove the Monitors, and

conduct a follow-up survey.  (ECF No. 1-2 ¶ 46).  In opposition, ITA argues that a license under

Section 881 should be granted only "in an appropriate case[,]" (ECF No. 11 at 5 (citing Chase I, 57

Misc. 2d at 1095–96)), which does not exist here because Pinnacle has failed to reasonably

protect the ITA Property.  (ECF No. 11 at 5–7).  Additionally, ITA seeks reimbursement of its

attorneys' fees and costs relating to the Project.  (Id. at 8).  In the Reply, Pinnacle argues "that

the potential hardship to [Pinnacle] should the license not be granted substantially outweighs

the minimal inconvenience to [ITA] in granting such a license."  (ECF No. 16 at 8).  In the Sur-

Reply, ITA contends that Pinnacle "has never showed in the Petition or in any other moving papers necessity and reasonableness of the entry[,]" presented false information to the LPC, refused to pay for ITA's costs, and "never discussed nor presented to the Court the pros and cons of the entry[.]"  (ECF No. 26 ¶¶ 16, 28, 31–32).

The Court analyzes the Section 881 factors and, for the reasons set forth below, respectfully recommends that Pinnacle be awarded a temporary license, with one modification and five additions noted below, (see § III.C.3, infra), to access the ITA Property for the limited purpose of installing protective measures to secure the ITA Property during the Project (the "License").

### a.  Factors One (Nature and Extent) and Three (Protection)

With respect to the first and third factors, the nature and extent of the access and the protections to the ITA Property, Pinnacle affirms that it seeks a license to enter the ITA Property only to the extent it can protect ITA's "Property . . . , employees . . . , and [] visitors during the course of the" Project.  (ECF No. 16 at 8; see ECF No. 1-2 ¶¶ 27–28).  ITA responds that Pinnacle "has failed to show how [it] intends to protect" the ITA Property.  (ECF No. 11 at 7).  The record reflects, however, that Pinnacle has provided ample evidence of how it will protect the ITA Property, (see ECF Nos. 1-18; 1-22; 1-23; 1-25), and in fact revised those plans when ITA articulated concerns with its proposal.  (See ECF Nos. 1-2 ¶¶ 16, 22; 1-3 ¶ 11; 1-12 ¶ 3; 1-13 at 2–7; 1-16 ¶ 50; 1-26 ¶¶ 3–4).  Further, Pinnacle asserts "that the limited worker access to" the ITA Property "will have very little impact on" ITA.  (ECF No. 1-2 ¶ 30).  These factors weigh in favor of granting Pinnacle's Petition.  See Panasia Est., Inc. v. 29 W. 19 Condo., 204 A.D.3d 33, 35–39 (1st Dep't 2022) (affirming license where petitioner sought to "install overhead protection, roof

protection, and flashing on respondents' properties and an outrigger and netting system above portions of the properties to protect the properties"); Queens Theater, 192 A.D.3d at 690 (same); see also Voron v. Bd. of Mgrs. of the Newswalk Condo., 63 Misc. 3d 1001, 1007 (Sup. Ct. Kings Cnty. 2019) ("Voron I") ("[L]icenses pursuant to [Section] 881 have been granted to enter upon the adjoining neighbor's property even in situations where the proposed work is intrusive[.]"), aff'd, Voron II, 186 A.D.3d 833.

### b.  Factor Two (Duration)

The second factor, duration of the requested access, initially weighs against Pinnacle's Petition.  Pinnacle asserts that it would require "limited worker access" of "no more than 18 working days" to the ITA Grounds and "no more than four working days" to the ITA Building, to install and remove the Monitors, Overhead Protection, and survey the ITA Grounds for any damages from the Project.  (ECF Nos. 1-2 ¶¶ 29–30; 16 at 5).  Pinnacle estimates that the Overhead Protection could be removed "within six months of its installation" and the Monitors could be removed "within three months of their installation[,]" but maintains "[i]n the event the [Project] is completed earlier than anticipated, [the] [C]ontractor shall remove the Overhead Protection and Monitors as soon as such removal is permitted."  (ECF No. 1-2 ¶¶ 33–34).  Despite Pinnacle's assertion that Overhead Protection and Monitors could be removed within six and three months of installation, respectively, Pinnacle requests "a 15-month license to accommodate any weather delays or other issues that would impact [the] [C]ontractor's ability to perform the [Project] within the anticipated time frame."  (Id. ¶ 34).  Although it anticipates its most elaborate protective measure, the Overhead Protection, to be removed within six months of installation, Pinnacle unreasonably requests more than twice as much time to account

for unspecified "issues" and "weather delays[.]"  (Id.) Without specificity, and with a proposal that only contemplates protections for a maximum of six months, Pinnacle has not shown that it is entitled to a 15-month license.  Accordingly, framed as a 15-month license, the second prong does not weigh in favor of Pinnacle.  With the Court's modification to nine months as set forth below, (see § III.C.3, infra), however, the duration becomes reasonable, and weighs in favor of granting the Petition.

### c.  Factor Four (Lack of Alternative)

The fourth factor, the lack of an alternative means to perform the work, weighs in favor of granting the Petition.  Pinnacle asserts that a license is "necessary to perform the" Project, (ECF No. 1-2 ¶ 40), and necessary "to comply with [a]pplicable [l]aws[,]" (ECF No. 16 at 8), including N.Y.C. Admin. Code §§ 3301 et seq., 1814.3, 309.4.4, and 3309.16.  (Id.; see ECF No. 1-12 ¶ 4).  ITA responds that "because of the discrepancies of the applications submitted before the" LPC and the DOB, "and because Pinnacle performed excavation work without a permit and contrary to shoring plans and scaffolding plans[,]" which resulted in the SWO and Reinspection Notice, the application for a license should be denied.  (ECF No. 11 at 6).  ITA cites no evidentiary support for either assertion, but the Court examines each assertion for completeness.

In the Opposition, ITA identifies two documents purporting to show discrepancies between the applications submitted and the Project: (i) a letter from Hirschberg (the "Hirschberg Letter"); and (ii) the Affidavit of Mr. Donald Friedman in Support of the Opposition (the "Friedman Affidavit").[10]  (ECF No. 10 ¶¶ 82, 101).

---

[10] Friedman is a Principal at Old Structures Engineering, licensed professional engineer, and an Adjunct Assistant Professor at Columbia University's Graduate School of Architecture, Planning, and Preservation. (ECF No. 10-26 ¶ 2).

ITA argues that the Hirschberg Letter "presented critical discrepancies" in the Pinnacle drawings, and included "misleading measurements that impact[]" the ITA Property.  (ECF No. 10 ¶ 82).  Hirschberg conceded, however, that he only reviewed "generally incomplete" documents, and did <u>not</u> consider "structural drawings, boring samples, and other relevant documents that . . . have not been shared with" ITA.  (ECF No. 10-17 at 1).  Hirschberg's chief concerns with the Project were "that an underpinning engineer will be 'brought-on-board' at a later time to address the issues/concerns raised by" ITA, that "[s]ignificant dimensional discrepancies were cavalierly dismissed . . . ," and that "when work is being performed this close to a landmarked structure it is appropriate to have these details determined and agreed upon before the design is finalized."  (<u>Id.</u>)  In its Reply, Pinnacle asserts it "revised its initial construction plans, at great cost to Petitioner[,]" submitted the revised plans "to the DOB for approval," and "approved copies were provided to" ITA.  (ECF No. 16 at 9).  In its Sur-Reply, ITA concedes that "Pinnacle['s] original plans showed underpinnings[,]" does not contest that Pinnacle has resolved Hirschberg's Concerns, and does not suggest any viable alternatives without entry onto the ITA Property.  (ECF No. 26 ¶ 23).  Hirschberg's remaining concerns, which relate to "the impact upon the [ITA Building]'s value[,]" and the "unique character defining feature of the" ITA Building, similarly fail to offer insight as to whether an alternative means to perform the Project exists.  (ECF No. 10-17 at 1–2).

ITA contends that the Friedman Affidavit suggests "that there may be a potential discrepancy between the drawings reviewed by the LPC and those presented at the" DOB.  (ECF No. 10 ¶ 101).  Friedman conceded that the scope of his review was limited in two fundamental ways.  (ECF No. 10-26 ¶¶ 3, 5).  First, Friedman evaluated "structural engineering issues only[.]"

(Id. ¶ 3).  Second, Friedman acknowledged that the design drawings he reviewed, dated October 7, 2021 and approved by the LPC on November 16, 2021, "may not be the most recent set of drawings, although, per the public records on the LPC web site, [the drawings are] the most recent set reviewed by the agency."  (Id. ¶ 5).  Friedman later concedes, however, "that the scope of work on LPC and D[O]B drawings is [sic] supposed to be the same and the most recent LPC drawings appear to be the ones I reviewed."  (ECF No. 10-26 ¶ 13).  The Court finds that the Friedman Affidavit does not weigh against granting a license to Pinnacle because Friedman points to no actual discrepancy between Pinnacle's applications to the LPC and the DOB, nor does he propose any alternatives for completion of the Project without entry onto the ITA Property.

Finally, ITA argues that "because Pinnacle performed excavation work without a permit and contrary to shoring plans and scaffolding plans," which resulted in the SWO and Reinspection Notice, the application for a license should be denied.  (ECF No. 11 at 6 (citing In re Tory Burch LLC v. Moskowitz, 146 A.D.3d 528, 529 (1st Dep't 2017)).  Moskowitz does not support ITA's position.  146 A.D.3d at 528.  In Moskowitz, the petitioner could not show reasonableness and need because it had not filed its plans with the DOB, let alone received the DOB's approval.  Id. at 529.  Here, in contrast, both the LPC and the DOB approved the Project, "the [SWO] has largely been rescinded, the scope of work addressed in the rescission of the [SWO] has resumed," and Pinnacle has taken remedial steps to resume the Project, including exchanging draft SOE plans with the DOB and preparing a Technical Report Soil Investigation for the DOB examiner's review.  (ECF No. 16 at 14; see ECF Nos. 14 ¶¶ 11–14; 15 ¶ 3).  Although Pinnacle has resolved three of the four issues identified in the SWO and Reinspection Notice, and intends to resolve the final issue, ITA, nevertheless, does not offer alternative methods for completion of the Project.  (ECF

No. 16 at 14; <u>see</u> ECF Nos. 14 ¶¶ 11–14; 15 ¶ 3).  Accordingly, the DOB's issuance of a SWO and

Reinspection Notice does not disqualify Pinnacle from receiving a license under Section 881.  <u>See</u>

<u>Tsoumpas 1105 Lexington Equities, LLC v. 1109 Lexington Ave. LLC</u>, 189 A.D.3d 524, 525 (1st Dep't

2020) (granting Section 881 license where "[u]nlike [<u>Moskowitz</u>], petitioner here has submitted

detailed site safety plans and proof that the stop work orders had been rescinded"); <u>65 Franklin,</u>

<u>LLC v. Franklin Broadway Holdings, LLC</u>, No. 154558/2022, 2022 WL 3757572, at *1 (Sup. Ct. N.Y.

Cnty. 2022) (granting Section 881 license after the DOB stop work order "was partially rescinded

and appear[ed] to be resolved").

Accordingly, the Court finds that the fourth factor weighs in favor of the Petition, because

ITA does not dispute that a license is necessary for Pinnacle to complete the Project and comply

with New York City building codes, and has not presented any "alternative methods of

construction" that Pinnacle could employ to complete the Project.  <u>Matter of Broadway Enters.,</u>

<u>Inc. v. Lum</u>, 16 A.D.3d 413, 414 (2d Dep't 2005).

### d.  **Factor Five (Public Interest)**

Although both parties agree that courts consider the fifth factor, the public interest in the

completion of the project, neither party offers any argument concerning this factor.  (<u>See</u> ECF

Nos. 1-2 ¶ 39; 11 at 7; 16 at 8).  Accordingly, the Court finds that the fifth factor is neutral.

### e.  **Factor Six (Compensation for Damages)**

The final factor, measures in place to  compensate ITA for any damage or inconvenience

resulting from the intrusion, weighs in favor of granting the Petition.  Here, Pinnacle affirms it

"will be responsible for performing work with due care and fixing damages in the unlikely event

that such damages occur and [ITA] will be protected financially as an additional insured on [the]

[C]ontractor's insurance policy."  (ECF No. 16 at 5; <u>see</u> ECF No. 1-2 ¶ 31).  ITA responds "there is no insurance that can protect the damages that [Pinnacle] is planning to cause to Respondent's property[,]" and, therefore, "[t]he best insurance is to deny this petition entirely."  (ECF No. 26 ¶ 26).

New York courts have found the adjoining property owner's financial interests protected where they are (i) named "additional insured on the relevant construction insurance policies" and (ii) where petitioner assumes an "obligation to indemnify the [respondent] for any loss[.]"  <u>Queens Theater</u>, 192 A.D.3d at 691 (citing <u>Special Projects Fund</u>, 154 A.D.3d at 944–45).  Because Pinnacle has offered to protect ITA's financial interests throughout the duration of the Project by naming it as an insured on the Contractor's general liability insurance policies, (<u>see</u> ECF Nos. 1-2 ¶ 31; 16 at 5), and will be obligated to indemnify ITA for any actual damages resulting from the Project, <u>see</u> N.Y. Real Prop. Acts. Law § 881, the sixth factor weighs in favor of granting the Petition.

\*      \*      \*

Because five of the six Section 881 factors weigh in favor of granting the Petition, and "the evidence supports the conclusion that [Pinnacle] would suffer an undue hardship if the [Section] 881 license were denied, whereas [ITA] will experience temporary and relatively minor inconvenience as a result of the issuance of the license[,]" the Court respectfully recommends that the Petition be granted and Pinnacle be granted the License containing the modified terms set forth below.  <u>Queens Theater</u>, 192 A.D.3d at 691; <u>see</u> <u>AIH</u>, 63 Misc. 3d 1231(A), at \*3 (same); <u>Special Projects Fund</u>, 154 A.D.3d at 945 (same).

### 3.  Terms of License

"Where a license under . . . [S]ection 881 is granted, this Court may order the petitioner to fulfill additional terms and conditions[.]"  AIH, 63 Misc. 3d 1231(A), at *3; see Cucs Housing Development Fund Corp. IV v. Aymes, No. 159303/2018, 2019 WL 934935, at *2 (Sup. Ct. N.Y. Cnty. 2019) ("Where a license pursuant to [Section] 881 is sought, the license can be compelled even though no agreement is reached, and in that situation, the terms of the license are set in the discretion of the court[.]").  Accordingly, the Court recommends that Pinnacle be granted a License containing the terms requested in the Petition, (see ECF No. 1-2 at ¶¶ 31, 46–47), with the modifications that: (i) the duration of the License is reduced from 15 to nine months; (ii) all costs relating to installing, maintaining, and removing the Overhead Protection and Monitors shall be paid by Pinnacle; (iii) Pinnacle shall return the ITA Property to its original condition within ten days of the License's expiration or the Project's completion, whichever is earlier; (iv) Pinnacle shall pay ITA a fee of $3,000.00 per month; (v) Pinnacle and the Contractor shall procure, maintain, and name ITA as an additional insured to a commercial general liability insurance policy through the duration of the Project; and (vi)  any damages ITA suffers from the License shall be repaired at Pinnacle's sole expense.  The reasons for these modifications are as follows.

As noted above, although Pinnacle requests "a 15-month license to accommodate any weather delays or other issues that would impact [the] [C]ontractor's ability to perform the [Project] within the anticipated time frame," the Court finds that 15 months is unreasonably long given that the proposal provides protections for only six months.  (See § III.C.2.b, supra).  Because "Section 881 provides that a license shall be granted 'upon such terms as justice requires[,]'" 2225 46th St., LLC. v. Giannoula Hahralampopoulos, 55 Misc. 3d 621, 623 (Sup. Ct. Queens Cnty.

2017) (quoting N.Y. Real Prop. Acts. Law § 881), and "[c]ourts are required to balance the interests of the parties[,]" Bd. of Managers of Artisan Lofts Condo. v. Moskowitz, 114 A.D.3d 491, 492 (1st Dep't 2014) ("Artisan Lofts II"), and a 15-month license exceeds the scope of what justice requires and unjustly imposes on ITA's right to exclude others, (see § III.A.2.b, supra), the Court modifies the term of the License to nine months.  See East Edge BK LLC v. Nedd, No. 522450/2021, 2022 WL 3083484, at *3 (Sup. Ct. Kings Cnty. 2022) (decreasing term of requested license from 16 months to 12 months); PB 151 Grand LLC v. 9 Crosby, LLC, 58 Misc. 3d 1219(A), at *6 (Sup. Ct. N.Y. Cnty. 2018) (decreasing term of requested license from 24 months to 12 months); see also AIH, 63 Misc. 3d 1231(A), at *3 (increasing term of requested license from 15 months to 18 months); Hahralampopoulos, 55 Misc. 3d at 623 (increasing term of requested license from "approximately four months" to one year where petitioner set "overly optimistic goal").

Further, the Court respectfully recommends the introduction of five additional terms to the License to "protect respondent's property interests." Meopta Properties II, LLC v. Pacheco, 185 A.D.3d 511, 512 (1st Dep't 2020).  First, to ensure ITA is "financially protected" throughout the term of the License, Queens Theater, 192 A.D.3d at 691, the Court recommends that Pinnacle (i) bear all costs relating to installing, maintaining, and removing the Overhead Protection and Monitors, (ii) reimburse ITA for any damages sustained by the ITA Property resulting from the Project, and (iii) procure, maintain, and name ITA as an additional insured to a commercial general liability insurance policy.  See id. (holding that naming property owner "as an additional insured on the relevant construction insurance policies and" requiring petitioner "to indemnify the [owner] for any loss" financially protected the owner); see also The Bd. of Managers of the Artisan Lofts Condominium v. The Bd. of Managers of the 137 Reade Street Condominium,

No. 150720/2022, 2022 WL 1057041, at *4 (Sup. Ct. N.Y. Cnty. 2022) ("Artisan Lofts I") (directing petitioner to name owner as additional insured on petitioner's policies and indemnify owner for any loss); 400 E57 Fee Owner LLC v. 405 E. 56th St. LLC, 193 A.D.3d 626, 626 (1st Dep't 2021) ("Equity requires that the owner compelled to grant access should not have to bear any costs resulting from the access[.]") (internal citation omitted); Meopta Properties II, 185 A.D.3d at 512 (affirming requirement that petitioner "obtain and maintain insurance to protect respondent's property interests"); East Edge, 2022 WL 3083484, at *3; PB 151 Grand, 58 Misc. 3d 1219(A), at *11; Carolina Mfg. Co., LLC v. Lan Chen Corp., No. 151794/17, 2017 WL 1520623, at *2 (Sup. Ct. N.Y. Cnty. 2017); 105 Eighth Ave., LLC v. J. W. Weber House Corp., No. 159500/2016, 2016 WL 7423825, at *3 (Sup. Ct. N.Y. Cnty. 2016).

Second, the Court recognizes that the License impinges on ITA's "right to exclude," Dolan v. City of Tigard, 512 U.S. 374, 393 (1994), a right "so universally held to be a fundamental element of the property right," Kaiser Aetna v. United States, 444 U.S. 164, 179–80 (1979), and, accordingly, recommends that Pinnacle return the ITA Property to its original condition within ten days of the earlier of the expiration of the License or the completion of the Project.  See 831 Knickerbocker, LLC v. Guzman, No. 513251/2021, 2022 WL 685409, at *3 (Sup. Ct. Kings Cnty. 2022) (directing petitioner to return the license area to its original condition within 20 days of project completion or license expiration, whichever is earlier).

Finally, because "the grant of licenses pursuant to [Section] 881 often warrants the award of contemporaneous license fees[,]" Panasia, 204 A.D.3d at 37 (citing DDG Warren LLC v. Assouline Ritz 1, LLC, 138 A.D.3d 539, 540 (2016)), the Court respectfully recommends that Pinnacle pay ITA a License fee of $3,000.00 per month.  See House 93, LLC v. Lipton, 178 A.D.3d

545, 545 (1st Dep't 2019) (awarding $2,000.00 for "her temporary loss of enjoyment to the small portion of the rear yard petitioner will be accessing pursuant to the limited license"); PB 151 Grand, 58 Misc. 3d 1219(A), at *6 (awarding $2,500.00 monthly license for scaffold placed on respondent hotel's terrace partially blocking view and limiting use of terrace); N. 7-8 Invs., LLC v. Newgarden, 43 Misc. 3d 623, 627 (Sup. Ct. Kings Cnty. 2014) (awarding $3,500.00 monthly license fee where respondent will have a cantilevered balcony protrude six feet into his air space); Ponito, 38 Misc. 3d at 613 (awarding $1,500.00 license fee to maintain sidewalk shed extending 20 feet in front of adjoining property); Rosma, 5 Misc. 3d 1014(A), at *5 (awarding $2,500.00 license fee for limited purpose of building sidewalk bridging, abutting approximately 10 feet onto the sidewalk in front of respondent's property).

Accordingly, the recommended provisions of the License are as follows:[11]

1. Pinnacle may place Overhead Protection and Monitors over/on the ITA Property for a period of up to nine (9) months from the date the SWO and Reinspection Notice are rescinded, and after Pinnacle has delivered a copy of the insurance policy to ITA.
2. Pinnacle may enter the ITA Property for a maximum of 18 days, including:
   o two working days to permit workers to survey the existing condition of portions of the ITA Property, at the commencement of the Project;
   o two working days to permit workers to install the Monitors on the ITA Property, at the commencement of the Project;
   o five working days to permit workers to install the Overhead Protection, at the commencement of the Project;
   o five working days to permit workers to dismantle the Overhead Protection, at the conclusion of the Project;
   o two working days to permit workers to remove the Monitors from the ITA Property, at the conclusion of the Project;
   o two working days to permit workers to conduct a survey of the existing condition of the ITA Property, at the conclusion of the Project.
3. Pinnacle shall be responsible for all costs relating to installing, maintaining, and removing the Overhead Protection and Monitors.

---

[11] Modifications from the license Pinnacle requested in the Petition are underlined.

4. Once the License has expired, or the Project has been completed, whichever is earlier, Pinnacle shall return the ITA Property to its original condition, and all materials used in construction, including the Overhead Protection and the Monitors, and any debris shall be removed from the License area within ten days.

5. Pinnacle shall pay ITA a fee of $3,000.00 per month.

6. Pinnacle and the Contractor shall procure and maintain a policy of commercial general liability insurance in an amount not less than $5 million per occurrence and excess limits, of not less than $10 million, on which ITA is named as an additional insured.

7. Pinnacle shall be liable to ITA for any damages which it may suffer due to this License and all damaged property shall be repaired at Pinnacle's sole expense.

**D. The Counterclaims**

In the Opposition, ITA asserts the Counterclaims against Pinnacle.  (ECF No. 10 ¶¶ 109–26).  "Counterclaimants bear the burden of establishing the Court's jurisdiction over the subject matter of their claims."  Goldman Marcus, Inc. v. Goldman, No. 99 Civ. 11130 (KMW), 2000 WL 297169, at *3 (S.D.N.Y. Mar. 21, 2000) (citing Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000)).  Here, ITA has not alleged any basis for the Court to exercise federal subject matter jurisdiction over the Counterclaims.  (See generally ECF No. 10 at 5–30).  Despite this failure, the Court fulfills its obligation to examine whether it has subject matter jurisdiction over the Counterclaims.  (See § III.A.1, supra).

**1. Legal Standards**

Federal Rule of Civil Procedure 13 governs counterclaims and, with certain exceptions not applicable here, provides that:

1)  **In General.** A pleading must state as a counterclaim any claim that-- at the time of its service--the pleader has against an opposing party if the claim:

   A.  arises out of the transaction or occurrence that is the subject matter of the opposing party's claim; and

> B.  does not require adding another party over whom the court
>     cannot acquire jurisdiction.

Fed. R. Civ. P. 13(a)(1)(A)–(B).  "Such counterclaims are compulsory in the sense that if they are

not raised, they are forfeited."  Jones v. Ford Motor Credit Co., 358 F.3d 205, 209 (2d Cir. 2004)

(citing Critical-Vac Filtration Corp. v. Minuteman Int'l, Inc., 233 F.3d 697, 699 (2d Cir. 2000)).

Further, compulsory counterclaims need "no independent basis of federal jurisdiction . . . for the

court to adjudicate the ancillary issues thus raised, if the main claim itself presents a colorable

federal issue."  Harris v. Steinem, 571 F.2d 119, 121–22 (2d Cir. 1978).

Correspondingly, "[a]ny counterclaim that is not compulsory . . . is considered

'permissive.'"  Torres v. Gristede's Operating Corp., 628 F. Supp. 2d 447, 467 (S.D.N.Y. 2008)

(quoting Fed. R. Civ. P. 13(b)).  "If a permissive counterclaim is raised in a federal district

court . . . an independent jurisdictional ground is required[.]"  Harris, 571 F.2d at 122 (citing Clark

v. Universal Builders, Inc., 501 F.2d 324, 341 (7th Cir. 1974)); see U.S. for Use & Benefit of

D'Agostino Excavators, Inc. v. Heyward-Robinson Co., 430 F.2d 1077, 1080 (2d Cir. 1970) ("Under

the rule in this circuit, if [counterclaims] are permissive there is no Federal jurisdiction over them

unless they rest on independent jurisdictional grounds."); see also Napoli v. Deluxe Corp., No. 17

Civ. 6957 (SJF) (SIL), 2019 WL 2579348, at *6 (E.D.N.Y. June 21, 2019) ("A permissive counterclaim

that does not otherwise carry an independent basis for subject matter jurisdiction, i.e. federal

question or diversity, must meet § 1367's criteria for supplemental jurisdiction.").

The Second Circuit has instructed that:

> [w]hether a counterclaim is compulsory or permissive turns on whether the
> counterclaim arises out of the transaction or occurrence that is the subject matter
> of the opposing party's claim, and this Circuit has long considered this standard
> met when there is a logical relationship between the counterclaim and the main
> claim. Although the logical relationship test does not require an absolute identity

of factual backgrounds, the essential facts of the claims must be so logically connected that considerations of judicial economy and fairness dictate that all the issues be resolved in one lawsuit.

Torres, 628 F. Supp. 2d at 467 (quoting Jones, 358 F.3d at 209).  In applying the "'logical relationship' test[,]" see Jones, 358 F.3d at 209 (quoting United States v. Aquavella, 615 F.2d 12, 22 (2d Cir. 1979)), "courts are to look to the logical relationship between the claims and determine 'whether the essential facts of the various claims are so logically connected that considerations of judicial economy and fairness dictate that all the issues be resolved in one lawsuit.'" Saleh v. Digital Realty Tr., Inc., No. 21 Civ. 9005 (PAE), 2022 WL 3139733, at *7 (S.D.N.Y. Aug. 5, 2022) (quoting Aquavella, 615 F.2d at 22); see D'Jamoos v. Griffith, 368 F. Supp. 2d 200, 204 (E.D.N.Y. 2005) ("The crucial inquiry with respect to pleadings is 'whether the essential facts of the various claims are so logically connected that considerations of judicial economy and fairness dictate that all the issues be resolved in one lawsuit.'") (quoting Harris, 571 F.2d at 123). "In other words, courts examine whether there is:  '(1) an identity of facts between the original claim and counterclaim; (2) a mutuality of proof; and (3) a logical relationship between the original claim and counterclaim.'" Phoenix Bulk Carriers, Ltd. v. Am. Metals Trading, LLP, 742 F. Supp. 2d 486, 489 (S.D.N.Y. 2010) (quoting May Ship Repair Contracting Corp. v. Oil Barge HT-100, No. 08 Civ. 280 (CPS) (RER), 2008 WL 6332375, at *2 (E.D.N.Y. Jan. 21, 2008).

"[E]ven where . . . , the Court lacks an independent basis for its exercise of subject matter jurisdiction over permissive counterclaims, it must still determine whether the claims fall under its supplemental jurisdiction pursuant to 28 U.S.C. § 1367." Torres, 628 F. Supp. 2d at 468; see Colonomos v. Ritz-Carlton Hotel Co., LLC, No. 98 Civ. 2633 (RCC), 2002 WL 732113, at *4 (S.D.N.Y. Apr. 25, 2002) ("Supplemental jurisdiction deals with subject matter jurisdiction, not personal

jurisdiction.") (quoting Huff v. Chandris SA, No. 93 Civ. 6685 (SS), 1994 WL 414467, at *4 (S.D.N.Y. Aug. 8, 1994)).  Section 1367 provides that,

> in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

28 U.S.C. § 1367(a).  "For purposes of § 1367(a), claims 'form part of the same case or controversy' if they 'derive from a common nucleus of operative fact.'" Krezic v. Advanced Endodontics of Buffalo, PC, No. 20 Civ. 1166, 2022 WL 1308448, at *1 (W.D.N.Y. May 2, 2022) (quoting Shahriar v. Smith & Wollensky Rest. Grp., Inc., 659 F.3d 234, 245 (2d Cir. 2011)).  "Claims derive from a common nucleus of operative fact where 'the facts underlying the . . . claims substantially overlapped or the [] claim necessarily brought the facts underlying the state claim before the court.'" Kriss v. Bayrock Grp. LLC, No. 10 Civ. 3959 (LGS) (DCF), 2017 WL 4023351, at *2 (S.D.N.Y. Sept. 12, 2017) (quoting Achtman v. Kirby, McInerney & Squire, LLP, 464 F.3d 328, 335 (2d Cir. 2006)); see Milner-Koonce v. Albany City Sch. Dist., No. 21 Civ. 1271 (LEK) (CFH), 2022 WL 1500995, at *10 (N.D.N.Y. May 12, 2022).

### 2. Application

ITA asserts Counterclaims against Pinnacle, (see ECF No. 10 ¶¶ 109–26), but has not alleged any basis of federal subject matter jurisdiction as to the claims.  (See generally ECF No. 10 at 5–30).

For the reasons set forth below, the Court respectfully recommends that, because the Counterclaims are permissive, and ITA has failed to allege an independent basis for federal subject matter jurisdiction, the Counterclaims be dismissed without prejudice.

### a. **Compulsory vs. Permissive**

#### i. **Identity of the Facts**

Here, the Court's analysis of Pinnacle's Section 881 Petition is distinct from ITA's negligence Counterclaims. Determining whether Pinnacle was negligent will require a review of Pinnacle's duties to ITA and conduct leading up to the filing of the Petition. (See ECF No. 10 at 6–23 ¶¶ 49–108 (describing at length parties' pre-Petition negotiations); id. at 23–26 ¶¶ 109–26 (alleging that Pinnacle breached duties owed to ITA by making various misrepresentations prior to the Petition)). In contrast, as discussed at length above, the Court's five-factor analysis of the Section 881 Petition addressed the reasonableness of granting access to the ITA Property, and whether Pinnacle's plans sufficiently protect the ITA Property going forward. (See § III.C.2.a–e, supra). These are two different analyses, which do not require consideration of either the same facts or the same legal standard. See Federman v. Empire Fire & Marine Ins. Co., 597 F.2d 798, 812 (2d Cir. 1979) (finding counterclaims that went "far beyond the purview of the plaintiff's claims" and concerned different time period were not compulsory). Accordingly, the first factor favors a finding that the Counterclaims are permissive.

#### ii. **Mutuality of Proof**

Likewise, the second factor, mutuality of proof, favors a finding that the Counterclaims are permissive. Because Pinnacle's Section 881 Petition and ITA's Counterclaims rely on distinct sets of evidence, "the quantum of proof required to establish the allegations of the [Section 881 Petition] would fall far short of the proof required to support" ITA's ability to recover damages based on the Counterclaims. Federman, 597 F.2d at 812; see Phoenix, 742 F. Supp. 2d at 490

(finding mutuality not met where "[t]he evidence needed to successfully prosecute the claims and counterclaims will plainly differ").

### iii.    Logical Relationship

Finally, while ITA's Counterclaims, like the Petition, relate to the Pinnacle Property and the ITA Property, the Court finds that the "essential facts of the various claims[,]" see Howell v. Town of Fairfield, 123 F.R.D. 429, 430 (D. Conn. 1988) (quoting Harris, 571 F.2d at 123), are fundamentally different, such that the "the transaction or occurrence" nexus required to find the Counterclaims compulsory is lacking here. See D'Jamoos, 368 F. Supp. 2d at 204. The Court has set forth and analyzed above the factors considered in evaluating the Petition under Section 881. (See § III.C.1, supra).   Conversely, ITA's Counterclaims would require the Court to analyze whether Pinnacle acted negligently by failing (1) "to provide accurate information regarding construction plans and provide a site safety plan pursuant to § 3301.13.1," (2) "to provide accurate information regarding construction plans and [failed] to apply for a new permit [when] any changes [were] made in the plans submitted to the [DOB] pursuant to § 25-305(b)(1)," and (3) "to provide application materials including a structural conditions report, a pre-construction site survey and a finished draft of the [DOB] Structural and Support of Excavation filings pursuant to § 2-16." (ECF No. 10 ¶¶ 109, 115, 121).  An analysis of negligence would necessarily require consideration whether Pinnacle owed ITA "a duty of care, breached that duty, and [evaluate whether] the breach proximately caused [ITA] injury." Truncellito v. Carroll's Florist Corp., 28 Misc. 3d 250, 254 (Sup. Ct. Richmond Cnty. 2010).  Because "a compulsory counterclaim must arise out of the transaction or occurrence that is the subject matter of the opposing party's claim[,]" Trustees of New York City Dist. Council of Carpenters Pension Fund v. MI Installers &

Furniture Servs., Inc., No. 12 Civ. 2362 (VM), 2013 WL 1385791, at *4 (S.D.N.Y. Mar. 28, 2013)

(original emphasis) (internal citations omitted), and here, the events giving rise to the

Counterclaims predate the Petition, the final factor favors a finding that the Counterclaims are

permissive.

Due to the lack of identity in facts, mutuality of proof, and logical connection between

the Petition and the Counterclaims, the Court concludes that the Counterclaims are not

compulsory, but instead, permissive.

### b. Jurisdiction Over Permissive Counterclaims

As noted above, permissive counterclaims such as those ITA asserts "require an

independent jurisdictional basis[.]" Four Seasons Solar Prod. Corp. v. Sun Sys. Prefabricated Solar

Greenhouses, Inc., 101 F.R.D. 292, 296 (E.D.N.Y. 1983). ITA has failed to allege any basis for

subject matter jurisdiction over the Counterclaims, and, therefore, has not satisfied its "burden

of establishing the Court's jurisdiction over the subject matter of their claims." Goldman Marcus,

2000 WL 297169, at *3 (citing Makarova, 201 F.3d at 113).

The Court may, nevertheless, consider whether there is an independent basis to exercise

supplemental jurisdiction under 28 U.S.C. § 1367(c). See Zap Cellular, Inc. v. Weintraub, No. 15

Civ. 6723 (PKC) (VMS), 2020 WL 5820319, at *9 (E.D.N.Y. Sept. 30, 2020). Here, we respectfully

recommend that the Court decline to exercise supplemental jurisdiction over the Counterclaims,

because none of the events or facts alleged in the Counterclaims are necessary nor relevant for

consideration of the Petition. (See § III.D.2.a, supra). The fact that both causes of action involve

the ITA Property does not, in and of itself, satisfy the "common nucleus of operative fact"

element. Absolute Activist Master Value Fund, Ltd. v. Ewing, No. 09 Civ. 8862 (GBD), 2014 WL

3600409, at *3 (S.D.N.Y. July 11, 2014) (quoting Shahriar, 659 F.3d at 245).  Further, absent from the Counterclaims is the "substantial[] overlap[]" required to establish a nexus between the Counterclaims and Section 881 Petition.  Kriss, 2017 WL 4023351, at *2.

Accordingly, we respectfully recommend that the Court decline to exercise supplemental jurisdiction over the Counterclaims.  See United States v. Dorio, 483 F. Supp. 3d 145, 155–56 (D. Conn. 2020) (dismissing counterclaims where "the court lack[ed] subject matter jurisdiction"); Unangst v. Evans L. Assocs., P.C., 798 F. Supp. 2d 409, 412 (N.D.N.Y. 2011) (dismissing counterclaim where "the two claims d[id] not share a sufficient factual relationship to form part of the same case or controversy"); Spencer v. Banco Real, S.A., 623 F. Supp. 1008, 1012 (S.D.N.Y. 1985) (dismissing counterclaims where "defendants have failed to show any independent basis of jurisdiction for the[ir] permissive counterclaims").

Should the Court decline to exercise supplemental jurisdiction, dismissal without prejudice is appropriate to permit ITA to assert the Counterclaims in the proper forum.  See HOV Servs., Inc. v. ASG Techs. Grp., Inc., No. 18 Civ. 9780 (PKC), 2021 WL 355670, at *3–4 (S.D.N.Y. Feb. 2, 2021) (dismissing counterclaims without prejudice where court declined to exercise supplemental jurisdiction).

### E.  The Third-Party Claim

Finally, in its Opposition, ITA asserts the Third-Party Claim against the LPC, and, like the Counterclaims, fails to state any basis for the Court's subject matter jurisdiction.  (ECF No. 10 ¶¶ 127–32).  Subject matter jurisdiction over the Third-Party Claim is a threshold issue that the Court must address sua sponte.  See Gonzalez v. Thaler, 565 U.S. 134, 141 (2012) ("When a requirement goes to subject-matter jurisdiction, courts are obligated to consider sua sponte

issues that the parties have disclaimed or have not presented."); <u>Rocky Aspen Mgmt. 204 LLC v. Hanford Holdings LLC</u>, 358 F. Supp. 3d 279, 282 (S.D.N.Y. 2019) ("Subject matter jurisdiction is a threshold issue, and courts must evaluate their jurisdiction over every claim, including cross-claims brought by or against impleaded third-parties."); <u>see also</u> <u>Loiacono v. Target Corp.</u>, No. 17 Civ. 535 (VAB), 2018 WL 2926279, at *3 (D. Conn. June 8, 2018) ("It is a fundamental precept that federal courts are courts of limited jurisdiction.").

### 1. <u>Legal Standards</u>

### a. <u>Subject Matter Jurisdiction</u>

The United States Supreme Court "has long recognized the rule that a foreign nation is generally entitled to prosecute any civil claim in the courts of the United States upon the same basis as a domestic corporation or individual might do." <u>Pfizer, Inc. v. Gov't of India</u>, 434 U.S. 308, 318–19 (1978). Courts reviewing whether it has subject-matter jurisdiction over a foreign state, or agency or instrumentality of a foreign state, have looked to 28 U.S.C. § 1332 to determine whether diversity jurisdiction exists. <u>See</u> <u>Eur. Cmty. v. RJR Nabisco, Inc.</u>, 150 F. Supp. 2d 456, 502 (E.D.N.Y. 2001); <u>Att'y Gen. of Canada v. R.J. Reynolds Tobacco Holdings, Inc.</u>, 103 F. Supp. 2d 134, 155 n.10 (N.D.N.Y. 2000), <u>aff'd</u>, 268 F.3d 103 (2d Cir. 2001); <u>Org. for Inv. Econ. & Tech. Assistance of Iran v. Shack & Kimball, P.C.</u>, No. Civ. A. 85–0437, 1988 WL 143323, at *1 (D.D.C. Dec. 28, 1988); 28 U.S.C. § 1332(a)(4).[12] "Complete diversity is required before federal

---

[12] 28 U.S.C. § 1332 provides:

    **a)**  The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between--

    . . .

courts may have subject matter jurisdiction over a case that does not involve a federal question."

Sty-Lite Co. v. Eminent Sportswear Inc., 115 F. Supp. 2d 394, 398 (S.D.N.Y. 2000); see Seemann v.

Maxwell, 178 F.R.D. 23, 24 (N.D.N.Y. 1998) ("Complete diversity of citizenship is required,

meaning that there cannot be citizens from the same State on opposing sides of the litigation.");

see also Guigliano v. Danbury Hosp., 396 F. Supp. 2d 220, 224 (D. Conn. 2005) ("Diversity

jurisdiction over a third-party claim depends on the citizenship of the third-party plaintiff and

defendant only.") (citing Caterpillar Inc. v. Lewis, 519 U.S. 61, 66–67 n.1 (1996)).

Here, the Court finds that it has subject-matter jurisdiction over the Third-Party Claim.

Diversity exists between the parties, as ITA is an agency or instrumentality of a foreign state, (see

§ III.A.1, supra), and the LPC is a New York City "municipal agency[.]"   (ECF No. 10 ¶ 57).   See

Kofinas v. Fifty-Five Corp., No. 20 Civ. 7500 (JSR), 2021 WL 3169155, at *2 (S.D.N.Y. July 27, 2021).

In addition, the amount in controversy—"no less than $75,000"—meets the statutory minimum.

(See ECF No. 10 ¶ 132).

### b.  **Rule 14**

Notwithstanding the existence of subject-matter jurisdiction over a third-party claim,

"[t]he decision to permit an impleader rests within the sound discretion of the trial court."

Embassy Elecs., Ltd. v. Lumbermens Mut. Cas. Co., 108 F.R.D. 418, 420 (S.D.N.Y. 1985) (citing

Oliner v. McBride's Indus., Inc., 106 F.R.D. 14, 20 (S.D.N.Y. 1985)); see Consol. Rail Corp. v. Metz,

115 F.R.D. 216, 218 (S.D.N.Y. 1987) ("[T]he right to implead third parties is not automatic, and

---

**4)**   a foreign state, defined in section 1603(a) of this title, as plaintiff and
citizens of a State or of different States.

28 U.S.C. § 1332(a)(4).

the decision whether to permit impleader rests within the sound discretion of the district court.")

(citing <u>Oliner</u>, 106 F.R.D. at 20).  Federal Rule of Civil Procedure 14 provides that,

> A defending party may, as third-party plaintiff, serve a summons and complaint on a nonparty who is or may be liable to it for all or part of the claim against it. But the third-party plaintiff must, by motion, obtain the court's leave if it files the third-party complaint more than 14 days after serving its original answer.

Fed. R. Civ. P. 14(a)(1); <u>see</u> <u>In re Customs & Tax Admin. of Kingdom of Denmark (SKAT) Tax Refund Litig.</u>, No. 18 MD 2865 (LAK), 2021 WL 4993536, at *8 (S.D.N.Y. Oct. 26, 2021).

"The general purpose of Rule 14(a) is to serve judicial economy, discourage inconsistent results, and limit the prejudice incurred by a defendant by removal of the time lag between a judgment against the defendant and a judgment over against a third-party defendant." <u>Comfort Sys. USA (Syracuse), Inc. v. Gateway Prop. Sols., Ltd.</u>, No. 21 Civ. 6017 (CJS), 2021 WL 4993079, at *2 (W.D.N.Y. Oct. 27, 2021) (quoting <u>Blais Const. Co. v. Hanover Square Assocs.-I</u>, 733 F. Supp. 149, 152 (N.D.N.Y. 1990)); <u>see</u> <u>iBasis Glob., Inc. v. Diamond Phone Card, Inc.</u>, 278 F.R.D. 70, 74 (E.D.N.Y. Oct. 21, 2011) ("Rule 14(a) was designed 'to promote judicial economy by eliminating the need for a defendant to bring a separate action against a third-party who may be secondarily or derivatively liable to the defendant for all or part of the plaintiff's claim.'") (quoting <u>Hines v. Citibank, N.A.</u>, No. 96 Civ. 2565 (RJW), 1999 WL 440616, at *2 (S.D.N.Y. June 28, 1999)); <u>see</u> <u>also</u> <u>Ainette v. Mkt. Basket Inc.</u>, No. 19 Civ. 04506 (DF), 2021 WL 1022590, at *6 (S.D.N.Y. Mar. 16, 2021) ("It is well established that [Rule 14] creates no substantive rights, but serves merely as a procedural device to expedite the presentation of a claim having a substantive basis in law.") (quoting <u>Johnson Controls, Inc. v. Rowland Tompkins Corp.</u>, 585 F. Supp. 969, 972 (S.D.N.Y. 1984)) (internal quotation marks omitted).

### 2. **Application**

In its Sur-Reply, ITA contends that "[i]t is both proper and prudent for the Court to add the LPC as a Third Party to adjudicate the matter instead of [ITA] having to commence a separate suit involving all of the named parties."  (ECF No. 26 ¶ 11).  The Court interprets this as a request from ITA to implead the LPC as a party.

To implead the LPC as a party, however, ITA was required under Rule 14 to <u>serve</u> the Opposition containing the Third-Party Claim on the LPC.  <u>See</u> <u>Chiaravallo v. Middletown Transit Dist.</u>, No. 18 Civ. 1360 (SRU), 2022 WL 3369722, at *1 (D. Conn. Aug. 16, 2022) (observing that Rule 14 provides that "'[a] defending party may, as third-party plaintiff, serve a summons and complaint on a nonparty who is or may be liable to it for all or part of the claim against it'") (quoting Fed. R. Civ. P. 14(a)(1)); <u>E.C. Contracting, Inc. v. D.F. Pray, Inc.</u>, No. 19 Civ. 6813 (FB) (VMS), 2022 WL 877809, at *4 (E.D.N.Y. Jan. 12, 2022) (same), <u>adopted</u> <u>by</u>, 2022 WL 875210 (E.D.N.Y. Mar. 24, 2022); <u>Comfort Sys.</u>, 2021 WL 4993079, at *2 (same).

There is <u>no</u> evidence on the docket that ITA has effected service on the LPC.  The fact that the LPC has not otherwise appeared and responded the Third-Party Claim reinforces that conclusion.  Even if impleading the LPC might "serve judicial economy, discourage inconsistent results, and limit the prejudice incurred by a defendant by removal of the time lag between a judgment against the defendant and a judgment over against a third-party defendant[,]" <u>Comfort Sys.</u>, 2021 WL 4993079, at *2 (quoting <u>Blais</u>, 733 F. Supp. at 152), the LPC must, nevertheless, be "serve[d] in compliance with Federal Rule of Civil Procedure 14[.]"  <u>Taylor Morrison, Inc. v. De Camps</u>, No. 22 Civ. 313 (JES) (KCD), 2022 WL 3213438, at *1 (M.D. Fla. Aug. 9, 2022).  Because

ITA failed to serve a summons and Opposition containing the Third-Party Claim on the LPC, it has not complied with Rule 14, and therefore, impleader of the LPC is not appropriate.

Accordingly, the Court respectfully recommends that ITA's Third-Party Claim be dismissed without prejudice.  See Staples, Inc. v. W.J.R. Assocs., No. 04 Civ. 0904 (SJ), 2005 WL 525543, at *6 (E.D.N.Y. Feb. 28, 2005) (dismissing third-party claim without prejudice where third-party defendants were served improperly); Taylor, 2022 WL 3213438, at *1 (instructing parties that third-party defendant "must [be] serve[d] in compliance with Federal Rule of Civil Procedure 14") see also Servidone Const. Corp. v. St. Paul Fire & Marine Ins. Co., No. 91 Civ. 0943 (NPM), 1992 WL 75064, at *7 (N.D.N.Y. Apr. 3, 1992) (declining to consider claims against third-party defendant who "ha[d] never been served with the third-party summons and complaint").

## IV.  CONCLUSION

For the reasons set forth above, the Court respectfully recommends that (i) the Petition be GRANTED, (ii) the Counterclaims be DISMISSED WITHOUT PREJUDICE, and (iii) the Third-Party Claim be DISMISSED WITHOUT PREJUDICE.

Dated:      New York, New York
            September 30, 2022

_____
SARAH L. CAVE
United States Magistrate Judge


*                    *                    *

**NOTICE OF PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION**

The parties shall have fourteen (14) days (including weekends and holidays) from service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1)

and Rule 72(b) of the Federal Rules of Civil Procedure.  See also Fed. R. Civ. P. 6(a), (d) (adding three additional days when service is made under Fed. R. Civ. P. 5(b)(2)(C), (D) or (F)).  A party may respond to another party's objections within fourteen (14) days after being served with a copy.  Fed. R. Civ. P. 72(b)(2).  Such objections, and any response to objections, shall be filed with the Clerk of the Court.  See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), (d), 72(b).  Any requests for an extension of time for filing objections must be addressed to Judge Torres.

**FAILURE TO OBJECT WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW.**  See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), (d), 72(b); Thomas v. Arn, 474 U.S. 140 (1985).